UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MICHAEL PIAZZA, JR.<br>Plaintiff, | CIVIL ACTION: |
| VERSUS | JUDGE: |
| ASSOCIATED WHOLESALE GROCERS, INC.<br>Defendant | MAGISTRATE: |
| | **JURY DEMANDED** |

# COMPLAINT

NOW COMES Plaintiff, Michael Piazza, Jr., ("Piazza" or Plaintiff) who brings this individual action pursuant to the Family and Medical Leave Act (FMLA) and the Americans with Disabilities Act (ADA) and complains against Defendant, Associated Wholesale Grocers, Inc. ("AWG" or Defendant), as follows:

## I. INTRODUCTION

1. Plaintiff brings this action to vindicate his individual rights under the ADA and FMLA against his former employer AWG.

## II. PARTIES

2. Plaintiff, Michael Piazza, Jr., is an adult citizen of the United States who is a domiciled in Louisiana.

3. Defendant, Associated Wholesale Grocers, Inc. is a Foreign Corporation authorized to do and doing business in Louisiana.

4. Plaintiff is a former employee of AWG.

## III. JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the action is brought under the ADA and the FMLA, both of which present Federal questions.

1

6. This Court has personal jurisdiction over Defendant because it conducts business and employs individuals in the judicial district.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b); business records are kept and all or a substantial part of the events giving rise to the claims occurred within this judicial district, including but not limited to the unlawful employment practices described herein.

## IV. STATEMENT OF FACTS

### A. Background of AWG

8. AWG is the nation's largest cooperative food wholesaler to independently owned supermarkets, serving over 3,800 locations in more than half of the states in the United States.

9. One of AWG's wholesale grocery distribution centers is located in Pearl River, Louisiana ("the Pearl River facility"), situated within the Eastern District of Louisiana.

10. The Pearl River facility is extremely busy and regularly employs over 300 employees at a time. The facility structure itself comprises more than 1,000,000 square feet under roof.

11. The facility regularly receives shipments of various grocery products including frozen foods, cold products, dry goods, and produce.

12. Facility workers unload the supply trucks, repackage the food products on pallets to then be loaded on trucks that will deliver the products to the grocery stores.

13. Because of the diversity of the products the facility handles, facility workers operate in a wide variety of settings from sub-zero temperatures in the frozen food area to the hot areas where dry goods and produce are often stored.

### B. Working Conditions at AWG's Pearl River Facility

14. The work at the Pearl River Facility is fast paced, incessant and physically demanding.

15. Working conditions were difficult but tolerable at the Pearl River facility until approximately

late in 2014 when AWG secured a large contract to provide wholesale grocery services to the Rouses chain of supermarkets.

16. At that time, the production demands at the facility skyrocketed, but AWG did not hire additional employees to meet the demand. To date, the facility remains understaffed.

17. In order to keep his job, Plaintiff was required to work excessive and unreasonable hours, sometimes as much as eighteen hours in a row, six days a week, resulting in many nights where he was only able to get three hours of sleep before his next shift began.

18. Worker turnover was frequent which resulted in many undertrained workers driving forklifts or otherwise moving heavy pallets of food products.

19. Heavy warehouse equipment was insufficiently maintained and was used in when it was only partially functional.

20. Workers were actively discouraged by management from taking breaks or even so-called "mandatory" half hour lunch breaks due to the pressure of work.

21. Workers were pressed to such a degree that many workers were felt compelled to urinate in bottles or relieve themselves in corners. Trash was impermissibly being stored in area alpha 98 and in the back of the warehouse for days and left to stagnate, with flies and maggots in evidence.

22. Workers were sometimes denied adequate protective clothing when required to work in subzero conditions for shifts lasting in excess of twelve hours.

23. Working conditions were dangerous and unsanitary at the Pearl River facility. AWG delivery trucks were frequently dirty and covered in places with black mold.

24. Sanitary facilities were few and remote from the workspaces, and custodial services were inadequate or sometimes missing altogether.

### C. Plaintiff's Employment with AWG

25. Plaintiff was one of the first hourly employees hired by AWG to run the Pearl River facility when it opened on or about February 2013.

26. Plaintiff worked well and to the satisfaction of his employer. He received regular raises and was repeatedly assigned to train new employees for two years until he became ill.

27. Plaintiff worked for AWG as a full time hourly laborer until his improper termination.

28. He primarily worked the night shift as a loader. His job duties included unloading product from delivery trucks and placing the products in the warehouse, repackaging product pallets to prepare for shipment, and loading delivery trucks with products.

### D. Plaintiff's Illness and Disability

29. In mid to late 2015, Plaintiff contracted a fungal infection in his lungs the symptoms of which include but are not limited to fever difficulty breathing.

30. Plaintiff had not been treated for any significant health problems prior to his being employed by Defendant, nor had he ever taken or been involved with Family and Medical Leave.

31. Plaintiff was followed and treated for this condition at Slidell Memorial Hospital by Dr. Janine Parker, pulmonologist and Dr. Mary Joubert, infectious disease specialist.

32. Plaintiff reported this medical information, including his early symptoms, to his supervisor Mike Smith and others, including the HR specialist Floyd Baker.

33. Plaintiff's supervisors, including Mike Smith, Shadi Rashad, Lloyd Faircloth and Bo Stewart each had specific and detailed knowledge about most of the issues set forth above.

34. Plaintiff was never offered or informed about the existence or availability of protected Family and Medical Leave even though he was entitled to FMLA leave.

35. Plaintiff never received any information about FMLA, never signed any papers concerning

FMLA, nor was Plaintiff ever informed of the status of his FMLA leave availability.

36. Rather, Plaintiff was placed on short term disability when his medical condition required that he be hospitalized to obtain biopsies of the lung tissue, in December of 2015.

37. Plaintiff returned to work after his biopsy, but he relapsed and was placed on short term disability.

38. When Dr. Parker obtained the results of the biopsy, she realized that Plaintiff was dealing with a serious lung infection, zygomycosis, or mucomycosis, the cause of which was determined to be a fungus informally deemed "black bread mold", a member of the Rhizopus fungus family which are characterized by a body of branching mycelia resembling the texture of cotton candy.

39. In humans, mucomycosis is a rare and dangerous disease which has an overall mortality rate of fifty percent. The infection invades blood vessels and can progress to other areas of the body, including the brain and lungs. Once contracted, the disease is difficult to eradicate in humans and symptoms often persist, even in cases involving successful recoveries, from six to twelve months or more.

40. At this point, Dr. Parker suggested to Plaintiff that he cease working in the sub-zero environment of the "cold side" at the Pearl River facility.

41. Plaintiff requested this accommodation from his supervisor, Shadi Rashad, who refused to discuss or even consider it.

42. As such, Plaintiff continued to struggle, working as a loader in the sub-zero environment even though work on the hot side existed in abundance and there was no reason that he could not have been reassigned to work as a loader on the hot side.

43. Plaintiff requested time off to visit his doctor get prescription refills and for follow up visits but Lloyd Faircloth told him he would be fired if he took more time off.

44. In a Thursday in the spring of 2016 Plaintiff called Floyd Baker (Baker), the HR manager at the Pearl River facility, to request long-term disability benefits. He stated to Baker that he was still suffering from surgical wounds from his biopsy and that he needed long-term disability benefits. Baker replied that if Plaintiff did not return to work immediately, by the following Monday, that he would be terminated.

45. At no point in this conversation was there any mention made of FMLA benefits. As far as Plaintiff was concerned, he had yet to take any FMLA leave. At no point in this conversation did Baker request Plaintiff to formally request long-term disability benefits.

46. On information and belief, this failure and refusal to permit Plaintiff to take Long Term Disability benefits constituted an unofficial practice by Defendant of denying its hourly workers all long-term disability leave potentially protected by the provisions of the FMLA.

47. After Plaintiff was refused long-term disability benefits Plaintiff returned to work for two weeks and then became seriously ill.

48. He returned to Slidell Memorial Hospital to consult his doctors and receive treatment for his lung infection and remained there for approximately a week.

49. Plaintiff again returned to work, but was repeatedly told by Lloyd Faircloth that if he missed work to see his doctor, who was only available to be seen in the afternoon, that he would be fired. Consequently, Plaintiff repeatedly missed his medical appointments to continue to work.

50. During this period Plaintiff continued to work long shifts, six days a week on the cold side and he contracted double pneumonia and lost about forty pounds of weight.

51. Plaintiff's symptoms continued to worsen.

52. In February 2017, Dr. Parker advised him that he would need to start attending his appointments and take his medication, or risk losing his life.

53. On or about February 6, 2017, Plaintiff attended a medical appointment with Dr. Talbot, his primary care doctor. Plaintiff requested that Dr. Talbot give him a return to work note to take to his employer. Dr. Talbot complied, and stated that Plaintiff could return to work without restrictions.

54. After leaving Dr. Talbot, Plaintiff arrived approximately four hours late for his shift. When Plaintiff clocked in he happened to see Lloyd Faircloth, who informed him that he could not work that day, and ordered him to go home. Faircloth further ordered Plaintiff to report back to work the next day at 2:30 PM.

55. The next day, February 7, 2016, Plaintiff arrived at the Pearl River facility at approximately 2:00 pm and before the start of his shift. He immediately reported to the main administrative office. Plaintiff tendered the return to work note to Lloyd Faircloth, who refused to take it or look at it. At that point AWG management at the Pearl River facility was fully informed of Plaintiff's medical condition and the recommendations which had been given by Plaintiff's treating physicians.

56. Despite Plaintiff's return to work authorization, AWG management at the Pearl River facility failed at this, and previous times, to engage in any dialog with Plaintiff concerning accommodations which could have enabled Plaintiff to return to work.

57. Despite his return to work authorization from his treating physician, AWG management at the Pearl River facility terminated Plaintiff for the stated reason of absenteeism due to medical illness.

58. For six months prior, Plaintiff had only been absent from his job because scheduled doctor's appointments.

59. Defendant's stated reason is pretext for Defendant's true motivation, which was, without

7

limitation, to terminate an employee who required accommodation to work his job, and to terminate an employee who they regarded as disabled, despite the fact that he could have continued to work as a loader had he been accommodated.

60. Plaintiff waited in the administrative office while the termination decision was reviewed by Mr. Beau Stewart, Defendant's manager in overall charge of the Pearl River facility. Floyd Baker, of Human Resources, soon informed Plaintiff that Mr. Stewart had personally reviewed the decision to terminate and that Mr. Faircloth and Beau Stewart supported and approved the termination.

61. In its actions and inactions regarding Plaintiff Defendant consistently and repeatedly displayed a reckless disregard for Plaintiff's federally protected rights.

## V. COUNT ONE: FMLA

62. Plaintiff brings this action for FMLA interference and FMLA retaliation.

63. AWG employs at least 50 people.

64. AWG employed Plaintiff.

65. Plaintiff worked more than a year at AWG.

66. Plaintiff worked more than 1,250 hours prior to attempting to take FMLA leave.

67. Plaintiff attempted to take FMLA leave to deal with his serious medical condition, which was ultimately diagnosed as zygomycosis.

68. AWG interfered with Plaintiff's right to take FMLA leave by failing to provide the requisite paperwork to Plaintiff or otherwise inform him of his right to take FMLA leave.

69. AWG also interfered with Plaintiff's FMLA rights by refusing to allow him to take intermittent FMLA leave to visit his doctor to address his serious medical condition.

70. As a result of Defendants' actions, Plaintiff suffered damages including but not limited to: lost wages, lost employment benefits, and actual monetary losses.

8

71. Because Defendant failed and refused to inform Plaintiff about the existence and availability of Family and Medical Leave, because Defendant also coerced Plaintiff into not taking Short Term Disability, which he was entitled to take in conjunction with FMLA, Defendant violated 29 U.S.C. § 2615(a)(1).

### VI.   COUNT TWO:  ADA

72. Plaintiff also brings this action under the ADA.

73. AWG employs more than 15 people.

74. Plaintiff was a qualified individual with a disability.

75. Plaintiff suffered from zygomycosis, and he could have performed the essential functions of his job as a loader with reasonable accommodation.

76. AWG failed to engage in a good faith interactive process to determine whether Plaintiff could perform the essential functions of his job with a reasonable accommodation.

77. Plaintiff requested that he be allowed to work in the non-cold areas of the facility to avoid the cold air that exacerbated his symptoms, but AWG refused and ultimately terminated him.

78. Plaintiff timely filed a Charge with the United States Equal Employment Opportunity Commission (EEOC) on October 16, 2017, complaining of violations of the ADA. The EEOC issued its right to sue letter on January 8, 2018. This complaint is timely filed.

79. Because Defendant failed to provide a reasonable accommodation to Plaintiff, who would otherwise have been able to perform all the essential tasks of his job, because Defendant failed and refused to even engage in dialog toward accomplishing that end, and because Defendant actually terminated Plaintiff because of his disability, and repeatedly displayed a reckless disregard of Plaintiff's federally protected rights, Defendant violated 42 U.S.C. § 12112(a) and (b)(5)(A).

80. As a direct result of the actions and inactions of Defendant, Plaintiff suffered harms and losses

in the following, non-exclusive respects: loss of back and front pay and benefits including but not limited to long term disability payments specifically due to FMLA interference; acute emotional distress, mental anguish, pain and suffering, inconvenience, medical expenses, inconvenience, loss of reputation and enjoyment of life.

81. Plaintiff desires and is entitled to TRIAL BY JURY.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

a. Enter judgment declaring that Defendant's policies and practices complained of herein violate the FMLA;

b. Enjoin Defendant, its officers and agents from engaging in the policies and practices complained of herein;

c. Enter judgment requiring Defendant to pay to Plaintiff damages including, but not limited to those set forth in 29 U.S.C. § 2617(a)(1);

d. Enter judgment requiring Defendant to pay to Plaintiff damages including, but not limited to, the following for its violations of the ADA: back pay, front pay, compensatory damages including emotional distress, mental anguish, pain and suffering, inconvenience, humiliation, loss of enjoyment of life, and medical expenses incurred as a result of the actions and inactions of its servants, and punitive damages in an amount sufficient to deter Defendant from repeating the conduct it has committed unto Plaintiff.

e. Enter judgment requiring Defendant to pay to Plaintiff's costs and expenses of bringing this action, including but not limited to reasonable attorney's fees, expert's fees and costs of sending notice to putative collective class members;

f. Enter judgment awarding to Plaintiff all further legal relief as this Court deems necessary, just and proper.

g. Grant unto Plaintiff a trial by jury.

                                        Respectfully submitted,

                                        <u>/s/Dale E. Williams</u>
                                        Dale E. Williams, Bar #18709
                                        212 Park Place
                                        Covington, Louisiana 70433
                                        Telephone: (985) 898-6368
                                        Facsimile: (985) 892-2640
                                        dale@daleslaw.com

                                        Chad A. Danenhower, Bar # 32845
                                        Danenhower Law Firm, LLC
                                        212 Park Place
                                        Covington, LA 70433
                                        Phone: 985-590-5026
                                        Fax: 985-605-0525
                                        chad.danenhower@danenhowerlaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MICHAEL PIAZZA, JR.<br>On behalf of themselves and all others similarly situated,<br>　　　　　　　　　　　Plaintiff,<br><br>VERSUS<br><br>ASSOCIATED WHOLESALE GROCERS, INC.<br>　　　　　　　　　　　Defendant | CIVIL ACTION: |

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury that I have read the foregoing Complaint, and the allegations contained in it are true and correct to the best of my knowledge.

Executed in Covington, Louisiana on this January 4, 2018.

_____
Michael Piazza, Jr.

10